IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00368-CR

 

Gary Shane Kinkaid,

                                                                      Appellant

 v.

 

The State of Texas,

                                                                      Appellee

 

 

 



From the 40th District Court

Ellis County, Texas

Trial Court No. 27777CR

 



Opinion

ON PETITION FOR DISCRETIONARY REVIEW



 

          As authorized by Rule 50 of the Rules of Appellate Procedure, we
issue this modified opinion within 30 days after the State filed a Petition for
Discretionary Review.[1]  Tex. R. App. P. 50.

INTRODUCTION

          Gary Shane Kinkaid pled guilty to the felony offense of aggravated
assault with a deadly weapon.  Adjudication was deferred and he was placed on
community supervision for a period of five years.  In the order placing Kinkaid
on deferred adjudication, the trial court did not enter a deadly weapon
finding.  The trial court ultimately revoked Kinkaid’s community supervision,
adjudicated his guilt, made a deadly weapon finding, and sentenced him to
twenty years in prison.  Kinkaid appeals his revocation.  In his sole issue,
Kinkaid contends that the trial court erred by entering an affirmative deadly
weapon finding in the order revoking his community supervision.

LAW AND ANALYSIS

          As the Sampson court explained, the purpose of making an
affirmative deadly weapon finding is to assist in calculating a prisoner’s
parole eligibility date.  Sampson v. State, 983 S.W.2d 842 (Tex. App.—Houston
[1st Dist.] 1998, pet. ref’d). Parole eligibility applies only to
incarcerated individuals.  It is not applicable when the adjudication of guilt
of a defendant has been deferred and he is placed on community supervision.  Id.  Therefore, a deadly weapon finding is not appropriate in an order of
deferred adjudication.  Id.

If a trial court determines a defendant has
violated the terms of his deferred adjudication and assesses imprisonment as punishment,
it is then appropriate to make an affirmative deadly weapon finding in the
order adjudicating guilt.  Tex. Code
Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (Vernon Supp. 2005).  In this
case, the trial court correctly entered the affirmative deadly weapon finding
in the order adjudicating guilt.

We overrule Kinkaid’s sole issue.   




CONCLUSION

          The trial court’s judgment is affirmed.  Our opinions and judgment
dated December 14, 2005, are withdrawn, and this opinion is substituted as the
opinion of the court.  Tex. R. App. P.
50.  The State’s Petition for Discretionary Review is dismissed by
operation of law.  Id.

 

          BILL
VANCE

          Justice

 

Before
Chief Justice Gray,

Justice Vance, and

Justice Reyna

          (Chief
Justice Gray concurring)

Affirmed


Opinion
delivered and filed February 15, 2006

Publish

[CR25]








 









    [1]       The
State’s PDR is an excellent discussion of the issue and the ramifications of
our original opinion.








70, 674 (Tex. 1988).
      Article V of the gas purchase agreement contains the “take or pay” provision, which reads:
Buyer agrees to receive and purchase or pay for if available for delivery and not taken,
and Seller agrees to deliver and sell to Buyer from Seller’s gas reserves, subject to the
limitations and conditions herein elsewhere provided, during each Accounting Period, the
Daily Contract Quantity multiplied by the actual number of days in the Accounting
Period.
The “Daily Contract Quantity” is defined as “70% of Seller’s Delivery Capacity.” Thus, TUFCO
is obligated to pay for 70% of Arcadia’s available delivery capacity, whether TUFCO chooses to
accept delivery or not.
      At issue in this case is what constitutes the “Seller’s Delivery Capacity,” which Article I
section 9 of the agreement defines as:
[T]he maximum quantity of gas which can be delivered per day to Buyer from Seller’s
Gas Reserves, against Buyer’s line pressure up to a maximum of 900 Psig averaged over
a period of seventy-two (72) hours, including that which can be delivered by compression
if compression is being utilized; such determined delivery capacity shall be effective from
the first day of the next succeeding month after such determination, and thereafter until
superseded by the results of the next determination thereof; provided, however, Seller’s
Delivery Capacity shall not exceed the quantity of gas available for delivery by Seller.

Initially, the well’s delivery capacity was based on a “G-10 deliverability test” performed in July
1983. According to the summary-judgment evidence submitted by Arcadia, which we must take
to be true, the test indicated a delivery capacity of 1890 million cubic feet (mcf) per day. It is
undisputed that since that date, the well’s actual gas production has been considerably less than
that amount. 
      At the heart of this dispute is the parties’ interpretation of the proviso, italicized above, 
included in the contract’s definition of delivery capacity. In points of error 1-4, Arcadia asserts
the trial court erred in construing the proviso in favor of TUFCO and rejecting Arcadia’s
interpretation, and asks us to reverse the summary judgment and render judgment for Arcadia. 
Alternatively, Arcadia contends the contract is ambiguous and asks us to remand for a factual
determination of its meaning. Whether a contract is ambiguous is a question of law for the court
to decide by looking at the contract as a whole in light of the circumstances existing at the time
the contract was made. Exxon Corp. v. West Texas Gathering Co., 868 S.W.2d 299 (Tex. 1993). 
When a written instrument is so worded that it can be given a certain or definite legal meaning or
interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. 
R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex. 1980). If a
contract is ambiguous, a motion for summary judgment cannot stand because the interpretation of
the instrument becomes a fact issue. Harris v. Rowe, 593 S.W.2d 303, 306 (Tex. 1980). If,
however, a contract is unambiguous, the courts will give effect to the intention of the parties as
expressed or as is apparent in the writing. Exxon Corp., 868 S.W.2d at 302.
      The proviso states that “Seller’s Delivery Capacity shall not exceed the quantity of gas
available for delivery by seller.” TUFCO argues this language operates as a continual cap on
Seller’s Delivery Capacity such that TUFCO can never be obligated to take or pay for gas that
could not have been actually delivered. Arcadia argues that the proviso applies only during the
72-hour deliverability test period. Arcadia reads the proviso as merely a clarification of “Seller’s
Delivery Capacity” in that it requires there be an amount of gas actually available for delivery by
which capacity can be measured during the 72-hour deliverability test period. As Arcadia puts it,
the proviso guarantees that “during the test, the well must actually have available for delivery an
average daily quantity of gas, equal to the determined Seller’s Delivery Capacity.” Arcadia’s
contention throughout this litigation has been that it was TUFCO’s obligation to request a
redetermination of the well’s delivery capacity, and until such redetermination was made, the 1983
G-10 results govern “Seller’s delivery capacity” for the entire term of the contract. Under
Arcadia’s interpretation, TUFCO had an ongoing responsibility to take or pay for 70% of the
delivery capacity as initially tested, or 1323 mcf per day (70% of 1890 mcf). 
      The agreement, read as a whole, provides a clear scheme by which TUFCO’s “take or pay”
liability may be determined during each accounting period. Article V binds TUFCO to purchase
and take or pay for the Daily Contract Quantity multiplied by the number of days in the accounting
period. Article I section 9 then defines “Daily Contract Quantity” as 70% of “Seller’s Delivery
Capacity.” Finally, Article I section 10 defines “Seller’s Delivery Capacity” as the maximum
amount of gas which can be delivered per day from Arcadia’s gas reserves averaged over a period
of 72 hours. Section 10 also stipulates that the initial deliverability test result governs delivery
capacity until superseded by a subsequent test, provided that Seller’s Delivery Capacity shall not
exceed the quantity of gas available for delivery. 
      The language used by parties to a contract should be afforded its plain, grammatical meaning
unless the intentions of the parties would thereby be defeated. Fox v. Thoreson, 389 S.W.2d 88,
92 (Tex. 1966). The word ‘provided’ in common speech expresses a qualification, limitation,
condition, or exception respecting the scope and operation of the words previously used. Knight
v. Chicago Corp., 144 Tex. 98, 188 S.W.2d 564, 567 (1945). “Although a proviso in statutes,
contracts or wills not infrequently introduces new or independent matter, its true office and its
general purpose is to restrict the sense or make clear the meaning of that which has gone before.” 
Id. at 567.
      The proviso in Article I section 10 is unambiguous. It refers to and restricts the scope of the
phrase immediately preceding it. As such, it constitutes an exception to the contract’s general
requirement that the initial and subsequent deliverability tests govern “Seller’s Delivery Capacity”
for all purposes throughout the term of the agreement. The proviso ensures that the “Seller’s
Delivery Capacity” cannot exceed the amount of gas available for delivery during any accounting
period. It protects TUFCO from the obligation to take or pay for gas that Arcadia could not
physically have made available for delivery during the accounting period.
      Arcadia argues TUFCO’s interpretation of the proviso contravenes the purpose of “take or
pay” clauses in gas purchase contracts. In Lenape Resources Corp. v. Tennessee Gas Pipeline
Co., the Supreme Court recognized that the “central purpose underlying take-or-pay contracts is
to allow the risk of fluctuations in the market demand to be allocated to the buyer.” 925 S.W.2d
565, 572 (Tex. 1996). Arcadia maintains that TUFCO’s attempt to limit its “take or pay”
obligation to gas available for delivery is an impermissible attempt to avoid the risk of demand
fluctuations. Properly construed, the “take or pay” provision guarantees Arcadia a demand for
its delivery capacity, but the proviso limits such delivery capacity to gas it could actually deliver
under the conditions prescribed. TUFCO still bears the risk of a decrease in demand for gas
actually produced because TUFCO must pay for at least 70% of all the gas Arcadia makes
available for delivery, regardless of whether TUFCO actually decides to take delivery. However,
the proviso ensures that TUFCO does not also bear the risk of a significant decrease in the well’s
ability to produce gas. We therefore hold that the gas purchase agreement requires TUFCO to
take or pay for 70% of the gas actually available for delivery during each accounting period. 
TUFCO’s interpretation of the contract was correct; Arcadia’s motion for partial summary
judgment was properly denied.
      That does not, however, end our inquiry. We next turn to the question whether TUFCO has
conclusively established compliance with the contract’s terms as we and the trial court have
interpreted them. In doing so, we apply the familiar summary-judgment standard of review. The
movant has the burden of showing that no genuine issue of material fact exists and that it is entitled
to judgment as a matter of law. See Nixon v. Mr. Property Mgmt. Co., 690 S.W.2d 546, 548
(Tex. 1985); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979). We
must accept all evidence favorable to the non-movant as true, indulging every reasonable inference
and resolving all doubts in favor of the non-movant. Wornick Co. v. Casas, 856 S.W.2d 732, 733
(Tex. 1993). We will consider evidence which favors TUFCO only if it is uncontroverted. See
Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex.
1965). 
      We note at the outset that the summary-judgment proof submitted by the parties was directed
largely toward the question of the proper construction of the agreement. Other summary-judgment
proof was directed toward TUFCO’s claims of waiver and modification. These claims are
conditional cross-points which, by virtue of our decision today, we do not reach. Thus, very little
of the summary-judgment evidence bears directly on the question which we must now address:
whether TUFCO established as a matter of law that it took or paid for 70% of the gas that was
available for delivery from the Mills Well during each accounting period.
      From the applicable summary-judgment evidence we can glean the following uncontroverted
facts:
      1.   The Mills Well was one of many wells from which TUFCO took gas.
      2.   When the Mills Well was operating at full capacity, it was producing the maximum
amount of gas “available for delivery.”
      3.   Because TUFCO was not contractually bound to take each well’s entire delivery capacity,
TUFCO had a policy of requesting percentages of the gas available from its producers
based on a monthly schedule referred to as its “market demand factor.”
      4.   Beginning in 1988, TUFCO’s market demand factor required that TUFCO request from
all its producers the following monthly percentages:
                  January       100%
                  February     100%
                  March          80%
                  April            60%
                  May             60%
                  June             80%
                  July            100%
                  August        100%
                  September    80%
                  October        60%
                  November    60%
                  December     80%



The market demand factor percentages never varied from year to year, and were calculated so that
TUFCO would take an average of 80% of the gas available for delivery every year from each of
the producing wells.
      4.   On a monthly basis, TUFCO contacted the “pumpers” responsible for the various wells’
gas flow and requested the increases or cutbacks necessary for the implementation of
TUFCO’s market demand factor.
      5.   Jack Burleson is a “pumper” who was responsible for the Mills Well and as many as
fifteen other wells producing gas for TUFCO.
      The difficulty in applying the above facts arises when one attempts to determine what
percentage of delivery capacity TUFCO took from the Mills well during any given month.


 
Burleson testified that TUFCO contacted him whenever it was necessary to change the well’s
production rate in order to comport with the market demand factor. An order changing the
production rate typically applied to all the TUFCO wells under Burleson’s control. However,
Burleson testified that the Mills Well was attached to a compressor, the purpose of which was to
increase the gas pressure to a level capable of delivering the gas into TUFCO’s pipeline. Burleson
further testified that reducing the flow rate or “choking back” the Mills Well neutralized the
purpose and effect of the compressor and was therefore impractical. Therefore, in response to a
request for a production cutback, Burleson would often allow the Mills Well to produce at full
capacity and correspondingly reduce the flow rate of a non-compressed well so that the wells
under his control collectively produced at a rate compliant with TUFCO’s market demand factor. 
At other times Burleson would completely shut the Mills Well down in response to a cutback
request. TUFCO’s market demand schedule therefore does not conclusively establish the
percentage of delivery capacity taken by TUFCO from the Mills Well during any particular month. 
As stated previously, TUFCO’s burden on appeal is to establish as a matter of law that they took
or paid for 70% of the gas actually available for delivery from the Mills Well during each
accounting period. Because the summary-judgment evidence does not reveal how often the Mills
Well was producing at full capacity and how often it was shut in, we simply cannot determine
from the summary-judgment evidence whether TUFCO took or paid for 70% of the gas available
for delivery from the well during each accounting period.
      Having reviewed the entirety of the record and employed all applicable standards, we
conclude there exists a genuine issue of material fact as to whether TUFCO took or paid for 70%
of the gas available for delivery from the Mills Well during each and every relevant accounting
period. Because a fact issue exists, summary judgment on this issue was improperly granted.
      Because the order granting TUFCO’s motion for summary judgment did not specify the
grounds relied on, we must affirm if any of the theories advanced are meritorious. Carr v.
Brasher, 776 S.W.2d 567, 569 (Tex. 1989). As an additional ground for summary judgment,
TUFCO invoked the contractual limitations clause located in Article IX section 4 of the gas
purchase agreement. That clause reads:
Each party hereto shall have, at its expense, the right at all times to examine the books
and records of the other party to the extent necessary to verify the accuracy of any
statement, charge, computation, or demand made under or pursuant to this Contract. 
Each party agrees to keep records and books of account in accordance with generally
accepted accounting principles and practices in the industry. Any statement shall be final
as to both parties unless questioned within two (2) years after payment thereof has been
made.

The “statements” referenced in the limitations clause are discussed in Article IX section 3:
After delivery of gas has commenced, or payments are due under the terms of this
Contract, Buyer shall, on or before the twenty-fifth (25th) day of each month, render to
Seller a statement showing the quantity of gas delivered during the preceding calendar
month and any adjustments made by Buyer, and shall therewith pay Seller the amount due
for all such gas. Buyer, at its election, may deduct from its payment to Seller sums, if
any, due by Seller to Buyer under the terms of this Contract.

TUFCO asserts that none of its statements or payments to Arcadia were challenged until the
contract was terminated in June 1996. Thus, to the extent that Arcadia may recover damages,
TUFCO argues that “they may not recover damages for deliveries made prior to June 1994.”
      We do not understand Arcadia to be seeking payment for “deliveries made.” Rather, Arcadia
asserts TUFCO failed to either take delivery of or pay for 70% of the well’s delivery capacity. 
Although the monthly statements mandated by section 3 would indicate the amount of gas taken
and the amount paid for the gas, they would not reveal whether TUFCO took the requisite
percentage of delivery capacity during the applicable accounting period. The limitations period
applies specifically to challenges to payments for gas delivered. It is inapplicable to a claim that
TUFCO failed to take or pay for the amount of gas agreed to in the contract. To the extent that
Arcadia may recover damages for TUFCO’s failure to take 70% of the well’s available delivery
capacity, its claim will not be barred by the contractual limitations period. 
                                                             CONCLUSION
       The gas purchase agreement required TUFCO to take or pay for 70% of the Seller’s Delivery
Capacity. We hold the proviso of Article I section 9 of the agreement is unambiguous; it limits
Seller’s Delivery Capacity to the amount of gas actually available for delivery throughout the term
of the agreement. Thus, Arcadia’s motion for partial summary judgment was properly denied,
and TUFCO was entitled to a partial summary judgment on the contractual interpretation question. 
However, TUFCO’s motion was improperly granted as the evidence raises a genuine issue of
material fact regarding the amount of gas TUFCO took or paid for. The summary judgment
granted TUFCO is therefore reformed to a partial summary judgment, and the cause is remanded
for a determination of whether TUFCO has taken or paid for 70% of the gas actually available
from the Mills Well during each accounting period. 
      The contractual limitations period in Article IX is inapplicable to Arcadia’s claim. We need
not consider whether any of the other grounds asserted in TUFCO’s motion for summary judgment
are meritorious, as they were contingent on Arcadia’s interpretation of the proviso. 
 
                                                                    BOBBY L. CUMMINGS
                                                                   Justice (Retired)


Before Chief Justice Davis,
      Justice Vance, and
      Justice Cummings (Retired)
Affirmed in part; reversed and remanded in part
Opinion delivered and filed July 7, 1999
Do not publish